JOURNAL ENTRY AND OPINION
Defendant-appellant Carlos Kincaid appeals from his convictions following a jury trial for drug possession (R.C. 2925.11) and conspiracy to commit possession of drugs (R.C. 2923.01), both with major drug offender and juvenile specifications. Defendant contends that the trial court erred in allowing defendant to be convicted of overlapping charges; in sentencing defendant on the major drug specification without requisite findings. Defendant also asserts he was prejudiced by prosecutorial misconduct and the ineffective assistance of his own counsel, and that the evidence was insufficient to sustain the convictions which were against the manifest weight of the evidence. We affirm the convictions, but remand for resentencing.
The following evidence was presented at trial. Sergeant Brian Heffernan of the Second District Vice Unit, testified that he was involved in the investigation which led to the arrest of the defendant. He stated that in late January or early February 1998 he received information which led him to begin a surveillance at several homes on the west side and the Amtrak station. The reason that the Amtrak station was placed on surveillance is that the information he received indicated that at least two individuals were going to travel from Cleveland to New York City. On February 8th, 1998, Det. Dvorak who was at the train station called in some information and, based on that information, the sergeant contacted several members of the Vice Unit and Strike Force to be at the train station that night. The unit also completed search warrants and affidavits and presented them to the judge so that the actual operational plan could begin.
Pursuant to the plan, Det. Dvorak set up surveillance at the train station in a vehicle, several detectives were set up inside and a detective acted as a look out from the Williard garage which is on a bluff above the Amtrak station. Two other detectives were sent to an address on Memphis Avenue to set up surveillance, where two vehicles, a Ford Explorer and a white Pontiac, known to be driven by the offenders involved, were located. The detectives then waited for the trains from New York to arrive during the early morning hours. The suspects did not arrive, so surveillance was again set for the next morning. The next morning around 5:00 a.m., the sergeant was told by one of the detectives that one of the vehicles left the Memphis Avenue address and was headed westbound and that a few minutes later, the second vehicle left going eastbound. Both vehicles then arrived at the Amtrak station around the same time, 5:15 a.m. The sergeant was observing the events from West 3rd Street and could see the two vehicles and the fact there were people inside of them. The vehicles were parked approximately three vehicles apart and did not make any communication with each other.
According to the sergeant, the detectives discovered that the train from New York was running one hour late, so the officers took the opportunity to change the stage location from West 3rd Street to the Huntington parking garage. The stage location is where the detective's cars are hidden and ready to go once the plan is executed. The train from New York arrived around 7:50 a.m. and the detectives in the county garage moved into position. The detectives stopped the Ford Explorer and a taxi as they exited the parking lot. The sergeant, along with Det. Escalante, secured the person of Henry Hernandez who was in the Ford Explorer with his common-law wife, Holli Morelli, and his three young children. They checked Hernandez for weapons and advised him they had a search warrant for his person, car and luggage. A search of Hernandez's person revealed about $500 cash and a search of Hernandez's bag revealed clothing including a yellow jacket. No drugs were found.
While the sergeant was searching Hernandez, other officers searched the defendant and Angel Torres who were in the cab. Three bricks of cocaine were found in each of defendant's and Torres' bag. The total amount of cocaine found was 4500 grams. The sergeant estimated that the cocaine had a street value of about a half million dollars. The sergeant's search of the defendant's person revealed a pager and $304 in cash.
Det. Jody Remington testified that she is on the strike force. She stated that she assisted in the surveillance of Hernandez's apartment on Memphis Avenue and observed a Ford Explorer leave the residence about 5:50 a.m. on February 10th and a white Pontiac left shortly thereafter. She and her partner attempted to follow the Pontiac, but lost sight of it in traffic. When she met with Sgt. Heffernan behind the Huntington parking garage on West 3rd she was told to go to the train station to see what time the train was to arrive.
In the station parking lot she noticed the two cars from Memphis Avenue were parked not very far from each other. The Ford Explorer was pulled up to a pay phone. Remington discovered that the train was running about an hour late, so the detectives congregated at the parking garage. When the train arrived she was sent down to the station with her partner to observe. She observed the defendant get off the train first carrying a duffel bag over his shoulder. He then went to the parking lot area as if he was looking for someone. A few seconds later, Angel Torres got off the train also carrying a bag. He then proceeded to the parking lot with defendant. After waiting outside a few moments they walked back into the station. Remington and her partner then observed Hernandez get off of the train and walk towards the parking lot. Hernandez then came back in the station and walk towards defendant and Torres stating, "they are not here yet." In response, she heard defendant state, "Damn, I knew we weren't suppose to get off here, were we?" The other two exclaimed, "Yes, we were." Remington thought that the defendant looked rattled because no one was there to pick them up. Torres then said, "Come on, let's go" and Torres and defendant made their way to a taxi while Hernandez made a phone call. After his phone call, Hernandez had a brief conversation with Torres and defendant by the taxi. Once the two men got into the taxi, Hernandez got into a waiting Ford Explorer. The taxi then proceeded to follow the Explorer. As the vehicles made their way to the exit, the other detectives came in and stopped them.
Remington ran up to the taxi with her partner, where she opened the back door and secured the defendant and patted him down for weapons. The bags in the trunk were opened and the six bricks of cocaine were discovered. Remington also aided in a search of Hernandez' s home on Memphis Avenues where she found a photograph taken at the Baja Beach Club in Orlando, Florida of Hernandez with the defendant which was dated August 16, 1996. Remington stated that when she questioned the defendant he claimed to not know Hernandez well, but that he was a good friend of Hernandez's brother. He also told her his decision to go to New York with Hernandez was a last minute decision as Hernandez's brother called offering him a free ticket to the All Star game.
Det. Escalante testified that in his career he had investigated about 200 to 300 cases involving New York based cocaine trafficking. He said that there is usually a leader or boss and the couriers or mules. He explained that the couriers are usually people that the boss has a lot of trust in. Escalante testified that the boss wants to remain "hands off" and "pays the mule to take the chances of being caught." (Tr. at 453). He stated that when traveling the couriers never use their real names so that they can deny ownership of any bags that are confiscated. When on the plane or train, the boss and couriers do not sit together. Escalante then went on to corroborate the testimony of Det. Remington and Sgt. Heffernan.
Det. Dvorak testified that he works for the Vice Unit for the Second District. He stated that Cleveland's source for the importation of most of its cocaine and heroin is New York City. He testified to the hierarchy of a drug organization which corroborated Det. Escalante's testimony. He also stated that he has never been involved in an investigation where a drug dealer has used an unpaid or unwilling courier. He stated that the reason is that the risk is too high that the unwilling courier would accidentally discover the drugs and then there is a risk of losing the drugs. Dvorak opined that the drugs found in this case had the street value of $500,000. Dvorak testified that when the surveillance of the train station began, he had the description of the defendant as one of the people that would be traveling to New York. He stated that at about 4:00 a.m. on February 8th, he saw the Ford Explorer pull up and defendant, Hernandez and Torres got out of the car. He said that defendant was wearing the yellow jacket which was found later in Hernandez's bag when the men returned. The men then got on the train together. Dvorak stated that he was excited because all the information he had received was confirmed and he knew that a big drug shipment was going to come through. Dvorak then proceeded to offer testimony which corroborated both Det. Remington and Sgt. Heffernan's testimony. He did indicate that his search of the defendant's person revealed a train ticket with the name Anthony Jones on it. No All Star game ticket stubs nor any All Star game souvenirs were recovered.
Angel Torres testified that he is currently serving time in prison for his part in the drug deal and that he pled guilty on the condition his wife would be let go and his children would not be taken away by the State. He does not have a prior felony conviction. He stated that he, his brother-in-law, Henry Hernandez, and defendant were all working together on the drug deal. They were to go to New York City where Hernandez was to obtain the drugs and Torres and defendant were responsible for bringing the drugs back. Hernandez was paying them $1,000 each to be the carriers. He stated that on February 7th, he and his wife and children spent the night at Hernandez's and that at about 1:00 or 2:00 a.m., the defendant showed up. They all went to sleep until it was time to go to the Amtrak station at around 4:00 or 5:00 a.m. He, defendant and Hernandez each brought a bag. They each bought their own ticket at the train station, but Hernandez gave them money to do so. They each gave a fictitious name when purchasing the tickets. Torres claimed that this was his first time as a drug carrier and he was told by Hernandez to just follow the defendant.
Once they arrived in New York they went to an apartment in the Bronx where a man named David Reyes lived. Reyes opened the door and greeted Hernandez and defendant and they introduced Reyes to him. They then went into the living room to watch the All Star game. Reyes' cousin arrived and Reyes and the cousin went into the kitchen to prepare the drugs for shipment. The defendant and Hernandez stayed in the living room, watching the game, while the cocaine was prepared. After the cocaine was prepared, they went out to eat at a restaurant and then stopped at a drugstore to buy some medication. They then prepared to return to Cleveland. He and the defendant took their bags into the kitchen where David put three bricks of cocaine into each bag. Torres said that Hernandez left about a half hour earlier then him and defendant because Hernandez did not want to be near the drugs. The men did not sit together on the train.
Once they arrived at the station, Torres looked for his wife. He had told her he went to the All Star game and was to pick him up at the station. When she did not arrive, he decided to take a taxi with defendant. Torres told the taxi driver to take him to East 91st and Detroit Avenue where his house was located. The police at that point ordered them out of the taxi and took the two bags out of the trunk.
Torres stated that the three did not see each other again until they were being held together in the holding cell prior to their first court date. At that time, they all agreed to state that they went to New York to attend the All Star game.
Defendant, 23 years old, testified in his own behalf. He stated that he had no prior federal or state offenses. He testified that he met Henry Hernandez through his brother, Jaimie, who the defendant use to work with at Ace Custom in 1995. He stated that the photograph the detectives found in his house was a photograph of Henry, Jaimie and himself when they went on a vacation together to Florida. Defendant testified that he went to New York City with Hernandez because Jaimie offered him his ticket to the All Star game since Jamie was unable to go due to a sick girlfriend. He spent the night at Hernandez's since they were leaving early in the morning. He claimed they stayed in a hotel when they got to New York City and went to Madison Square Garden where the game was held. After the game, Angel Torres went back to the hotel while Hernandez and defendant went to various nightclubs. When defendant returned to the hotel room he went to sleep. When he woke up, they all went to breakfast. After breakfast, Torres again went back to the hotel while Hernandez and defendant walked around the city. Later, they all went to dinner, then proceeded to take the train back to Cleveland. He stated that they did not sit together because the conductor told them where to sit. Defendant claimed to have no idea that he was transporting drugs.
Defendant's supervisor from City Year testified that defendant was a hard worker and that he never had any problems with him. He stated that defendant made approximately $150 week as a teacher's aide.
The jury found the defendant guilty of drug possession and conspiracy to commit possession of drugs, both with major drug offender and juvenile specifications. He was subsequently sentenced to nineteen years in prison.
Defendant timely appeals assigning six assignments of error for our review. We will address the assignments of error in the order presented and together where they involve common issues of law or fact.
 I. THE TRIAL COURT ERRED IN ALLOWING THE DEFENDANT TO BE CONVICTED OF BOTH A CHARGE OF DRUG POSSESSION AND A CHARGE OF CONSPIRACY TO COMMIT THE SAME OFFENSE.
Counsel for defendant withdrew this assignment of error at oral argument so we will give no consideration to same.
 II. THE TRIAL COURT ERRED IN SENTENCING THE DEFENDANT TO NINE YEARS ON THE MAJOR DRUG OFFENDER SPECIFICATION WITHOUT MAKING THE REQUISITE FINDINGS ON THE RECORD.
Defendant contends that the trial court should have followed the sentencing guidelines set forth in R.C. 2929.14 (D) (2) (b) (i) and (ii) with respect to the additional term of nine years pursuant to R.C. 2929.14 (D) (3) (b). We agree.
R.C. 2929.14 provides in pertinent part that:
 (3) (a) * * * if the offender commits a violation of section 2925.03, 2925.04, or 2925.11 of the Revised Code and that section requires the imposition of a ten-year prison term on the offender or if a court imposing a sentence upon an offender for a felony finds that the offender is guilty of a specification of the type described in section 2941.1410
[2941.14.10] of the Revised Code, that the offender is a major drug offender, is guilty of corrupt activity with the most serious offense in the pattern of corrupt activity being a felony of the first degree, or is guilty of forcible violation of section 2907.02 or 2907.12 of the Revised Code with the victim being under thirteen years of age * * *, the court shall impose upon the offender for the felony violation a ten-year prison term that cannot be reduced pursuant to section 2929.20 or chapter 2967. or 5120 of the Revised Code.
 (b) The court imposing a prison term on an offender under (D) (3) (a) of this section may impose an additional prison term of one, two, three, four, five, six, seven, eight, nine or ten years, if the court, with respect to the term imposed under division (D) (3) (a) of this section and, if applicable, divisions (D) (1) and (2) of this section, makes both of the findings set forth in divisions (D) (2) (b) (i) and (ii) of this section.
In order to impose an additional sentence to the maximum sentence, the trial court must make both findings set forth in R.C. 2929.14 (D) (2) (b) (i) and (ii). State v. Hill (February 19, 1999) Hamilton App. No. C-971098, unreported at 28-29; Statev. Purvey (July 21, 1999), Lorain App. No. 97CA006935, unreported at 9-10. As the court in State v. Hill, supra at 28-29 explained:
 Hill was found guilty of possession of cocaine under R.C. 2925.11 (A), and he was found to be a major drug offender. Pursuant to R.C. 2925.11 (C) (4) (f), "the court shall impose as a mandatory prison term the maximum prison term prescribed for a felony of the first degree and may impose an additional mandatory prison term prescribed for a major drug offender under division (D) (3) (b) of section 2929.14 of the revised code." Under R.C. 2929.14 (D) (3) (b), a court may impose additional prison terms of one to ten years only if the court makes both findings set forth in divisions (D) (2) (b) (i) and (ii) of R.C. 2929.14. Under R.C. 2929.14 (D) (2) (b) (i), the court must determine whether an unsupplemented term would be inadequate to punish the offender and to protect the public because the applicable factors under R.C. 2929.12 indicate that there is a likelihood of recidivism. Second, the court must find that, under R.C. 2929.14 (D) (2) (b) (ii), an unsupplemented term would be demeaning to the seriousness of the offense because one or more of the factors under R.C. 2929.12 are present and outweigh the factors indicating that the offender's conduct is less serious than conduct normally constituting the offense.
A review of the record herein indicates that the trial court made no findings as are required under R.C. 2929.14 (D) (3) (b) for imposing an additional sentence. The trial court only justified the basis for imposing the maximum term. We, will, therefore, remand the matter for re-sentencing consistent with this opinion.
Defendant's Assignment of Error II is sustained.
 III. THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BECAUSE OF PROSECUTORIAL MISCONDUCT AT TRIAL WHICH SUBSTANTIALLY PREJUDICED AND MISLED THE JURY.
Defendant contends the prosecuting attorney "made remarks within the presence of the jury designated to imply that Mr. Kincaid had taken several trips to New York City as `Mule,' or carrier of illicit drugs, for the alleged co-conspirator Henry Hernandez." (Aplt's Brf. at 12). Defendant charges that two instances of prosecutorial misconduct, once during the cross-examination of the defendant and once during sentencing, denied him his right to a fair trial as guaranteed under the United States and Ohio Constitutions. This argument is without merit.
During cross-examination of the accused, the State asked the following questions:
 Q. How many trips have you done for Henry to New York?
A. Never done a trip.
 Q. Isn't it true that this was your seventh trip?
A. Who?
Q. Seventh?
A. Who? Who told you that?
COURT: Stop asking questions. You're here to answer questions, Mr. Kincaid.
WITNESS: Sorry.
 Q. Isn't it true that this is your seventh trip?
A. No, that's not true. That is incorrect.
(Tr. at 608-609)
Defense counsel failed to raise any objection to this line of questioning. The Ohio Supreme Court has repeatedly held that errors which are not brought to the attention of the trial judge by objection or otherwise are waived and may not be raised on appeal unless such errors rise to the level of plain error. Statev. Campbell (1994), 69 Ohio St.3d 38, 40-41; State v. Willifford
(1990), 49 Ohio St.3d 247, 251; State v. Underwood (1983), 3 Ohio St.3d 12, syllabus. In State v. Landrum (1990), 53 Ohio St.3d 107, the Court stated:
 Notice of plain error under Crim.R. 52 (B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.
Id. at 111.
Crim.R. 52 (B) states that "plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." However, an alleged error "does not constitute plain error or defect under Crim.R. 52 (B) unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Long (1978). 53 Ohio St.2d 91, at paragraph two of syllabus.
We cannot say the result would have been otherwise but for the prosecutor's questions. Defendant's co-defendant, Angel Torres, had testified against the defendant. In his testimony, Torres had stated that he did not know what to do since it was his first time as a courier, but that the leader, Hernandez told him to just follow the defendant. The implication of this was that it was not the defendant's first time he traveled to New York to transport cocaine back to Cleveland. Therefore, the fact that the prosecutor alluded to the fact that it was the defendant's seventh time as a drug courier was insignificant especially in the face of defendant's denial. Torres' testimony also completely implicated the defendant's active participation in the transport of the drugs. We, therefore, cannot say that the prosecutor's questioning constituted plain error.
Regarding the statements made during sentencing, a review of the record indicates that it was Det. Dvorak, not the prosecutor, who informed the judge that it was not the defendant's first time transporting drugs. The detective had asked to be heard at sentencing so that he could ask that the maximum sentence be imposed. Since the prosecutor did not make the statement, it cannot be said that it constituted prosecutorial misconduct.
Defendant's Assignment of Error III is overruled.
 IV. THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO PROTECT HIS RIGHTS AT AND BEFORE TRIAL.
Most recently, the Ohio Supreme Court has stated the standards to be applied in determining whether counsel's assistance was constitutionally ineffective in State v. Calhoun (1999), 86 Ohio St.3d 279,289:
 The United States Supreme Court has established a two-step process for evaluating an allegation of ineffective assistance of counsel:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.
 In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396-397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.
 On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. See Vaughn v. Maxwell
(1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164; State v. Jackson, 64 Ohio St.2d at 110-111, 18 O.O.3d at 351. 413 N.E.2d at 822.
In the first place, defendant argues that his counsel failed to adequately challenge the search warrant. Counsel filed a motion to suppress, but did not request a hearing. Defendant argues that "[w]ithout putting the search to the test of a hearing by the court, properly held in open court and resulting in findings of facts by the court, there is no guarantee that Mr. Kincaid's rights were not violated." (Aplt's Brf. at 16). As mentioned before, it has been recognized that the decision of trial counsel not to pursue every possible trial tactic does not result in ineffective assistance of counsel. See, also, State v. Brown 
(1988) , 38 Ohio St.3d 305, 319; State v. Johnson (1986), 24 Ohio St.3d 87. It is for trial counsel to decide whether the suppression issue is a strong or weak one. In the present case, defendant was represented by two experienced attorneys at trial. He fails to demonstrate that by not pursuing the suppression argument trial counsel was ineffective and that defendant suffered any prejudice resulting from it.
The defendant also argues that trial counsel was ineffective in advising defendant to waive his right to a speedy trial. Defendant assumes this was to allow the State more time to prepare its case against defendant. However, the record is devoid of any factual basis for such a claim. Our review of the record reveals that the trial was continued several times to allow defense counsel to properly prepare after replacement counsel was brought in.
Defendant also claims ineffectiveness of counsel because counsel failed to object to his being tried and convicted on both the possession and conspiracy charges and counsel's failure to object to the prosecutorial misconduct previously asserted.
As discussed in Assignment of Error II, the trial court properly abided by R.C. 2923.01 (b) by merging the sentence of the conspiracy count with the possession count. We also found in Assignment of Error III that the prosecutor's questioning did not constitute misconduct.
Defendant's Assignment of Error IV is overruled.
 V. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S RULE 29 MOTION AS TO KNOWING DRUG POSSESSION IN COUNT ONE AND CONSPIRACY IN COUNT TWO, WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE THAT THESE OFFENSES HAD BEEN COMMITTED.
 VI. THE JURY'S DECISION FINDING THE DEFENDANT GUILTY OF KNOWING POSSESSION OF DRUGS AND CONSPIRACY TO COMMIT POSSESSION OF DRUGS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE SINCE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THESE OFFENSES HAD BEEN COMMITTED.
Defendant argues his convictions for possession of drugs and conspiracy were not supported by sufficient evidence and were against the manifest weight of the evidence because there was no evidence he "knowingly" possessed the drugs or that he aided in the planning of transporting the drugs.
The standard of review we must observe in passing on sufficiency of the evidence and manifest weight of the evidence issues were set forth by the Supreme Court of Ohio as follows inState v. Thompkins (1997), 78 Ohio St.3d 380, 386-87:
 The state asserts that sufficiency of the evidence and weight of the evidence are synonymous legal concepts. They are not. The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.
 With respect to sufficiency of the evidence, ""sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29 (A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict, is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount off credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ""thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.")
Possession of drugs is defined in R.C. 2925.11 as follows:
 (A) No person shall knowingly obtain, possess, or use a controlled substance.
The record shows that defendant went to Henry Hernandez's house the night before departing for New York; that Angel Torres was told to follow him; that he arrived at the apartment of David Reyes in New York City along with Angel Torres and Henry Hernandez; that he waited on the couch while the cocaine was bring prepared in the next room; that once the cocaine was ready, defendant and Angel Torres brought their bags to the kitchen so the cocaine could be placed in the bags; and three bricks of cocaine were found in defendant's bag after he arrived back in Cleveland. Defendant's conduct was sufficiently portrayed by the evidence to fit the description of possession of drugs.
"Knowingly" is defined in R.C. 2901.22 as follows:
 (B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause certain result or will probably be of certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
"Conspiracy" is defined in R.C. 2923.01 as follows:
 (A) No person, with the purpose to commit or to promote or facilitate the commission of * * * a felony drug * * * possession offense * * * do either of the following:
 (1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
The record amply demonstrates that the defendant aided and conspired with Angel Torres and Henry Hernandez in the commission of the offense of possession of drugs. Both counts were supported by sufficient evidence to go to the jury under Crim.R. 29 (A). By the same token, the manifest weight of the evidence clearly supported the defendant's convictions for these crimes. Notwithstanding his pleas of innocence, he was an integral part of the scheme to bring illegal drugs back from New York City.
Defendant's Assignments of Error V and VI are overruled.
Judgment affirmed; remanded for resentencing.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DYKE, J. and JAMES D. SWEENEY, J., CONCUR.
 __________________________________ JAMES M. PORTER ADMINISTRATIVE JUDGE